UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------
EMANUEL OSITA OKOCHA,

               Plaintiff,

    -against-                           08 Civ. 8650 (MHP)

HSBC BANK USA, N.A., et al.,

               Defendants.
-------------------------------------------------------

## MEMORANDUM AND ORDER

MARILYN HALL PATEL, *District Judge*.[1]

    Plaintiff Emanuel Osita Okocha brought this action against HSBC Bank USA, N.A., HSBC Bank Nevada, N.A., HSBC Card Services, Inc., and HSBC Card Services (II), Inc., (collectively, "HSBC" or "defendants") for their alleged mishandling of his deposit and overdraft accounts as well as related correspondence with credit reporting agencies. The matter proceeded to a two-day jury trial commencing December 7, 2010. At the close of evidence, defendants moved for judgment as a matter of law, which the court granted, indicating that a written order would follow. Having considered the parties' arguments and submissions, and for the reasons stated below, the court enters the following memorandum and order.

Background

    The factual background of this action is set forth more fully in the court's March 25, 2010 order on defendants' motion for summary judgment. *See Okocha v. HSBC Bank USA,*

---

[1] The Honorable Marilyn Hall Patel, United States District Court for the Northern District of California, sitting by designation.

*N.A.*, 700 F. Supp. 2d 369 (S.D.N.Y. 2010) (Kaplan, J.).[2] The court previously dismissed fifteen of plaintiff's nineteen claims in their entirety and dismissed in part plaintiff's remaining four claims to the extent they reached conduct occurring outside the applicable limitations period. *Id.* This matter proceeded to jury trial on four claims: (1) claim 1, under the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693, *et seq.*, for conduct occurring on or after October 9, 2007; (2) claim 2, under the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1632, 1666, for conduct occurring on or after October 9, 2007; (3) claim 5, under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681s-2(b), for conduct occurring on or after October 9, 2006; and (4) claim 15, under New York law, for negligent handling of deposit account disputes on or after October 9, 2007 and for negligent handling of overdraft account disputes on or after October 9, 2005.

At trial, plaintiff testified on his own behalf. He called only one other witness in his case-in-chief, his friend Dr. Emmanuel Nwokedi, who testified in his lay capacity as to plaintiff's purported emotional distress. Defendants presented three HSBC employees in their case-in-chief.[3] Deborah Falbo, a Compliance Officer with HSBC Bank USA, and Pamela Foster, Department Manager at HSBC Personal Financial Services, testified as to the terms and conditions underlying plaintiff's deposit and overdraft accounts as well as HSBC's customer

---

[2] On November 24, 2010, this case was reassigned to the undersigned from Judge Kaplan. *See* Docket No. 82.

[3] In order to accommodate Dr. Nwokedi's schedule, defendants agreed to present two of their three witnesses before plaintiff rested his case. In doing so, defendants adequately preserved their right under Fed. R Civ. P. 50(a) to move for judgment as a matter of law at the conclusion of plaintiff's case-in-chief. Nevertheless, the court grants the motion even when considering the testimony of defendants' witnesses.

2

service records regarding those accounts. Theresa Nylund, a Back Office Representative at HSBC Card Services, testified as to HSBC's procedures for investigating disputes between customers and credit reporting agencies. At the close of evidence on December 8, 2010, defendants moved for judgment as a matter of law, which the court granted for the reasons stated below.

Legal Standard

Under Federal Rule of Civil Procedure 50, a court may grant judgment as a matter of law on any claim for which "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a)(1). In ruling on a motion for judgment as a matter of law pursuant to Rule 50, a court must consider all evidence presented, drawing all reasonable inferences in favor of the nonmoving party, without making credibility determinations or weighing the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000). In evaluating this evidence without making credibility determinations, the court must "disregard any evidence favorable to the moving party which the jury is not required to believe." *Id.* at 151.

Discussion

I.   Claim 1: EFTA

EFTA provides a "basic framework establishing the rights, liabilities and responsibilities of participants" in electronic banking. *See* 15 U.S.C. § 1693(b). Plaintiff argues that defendants violated EFTA by repeatedly debiting his deposit account in order to offset a disputed amount due on his overdraft account. At issue are defendants' duties regarding "preauthorized electronic transfers" under §§ 1693e & 1693k, as well as the procedures it must follow for handling

disputed electronic fund transfers under § 1693f.[4]

Section 1693k prohibits a creditor from "condition[ing] the extension of credit to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers." Section 1693e only permits "preauthorized electronic fund transfers" if the consumer's authorization is in writing and made available to the consumer upon request. 15 U.S.C. § 1693e(a). A consumer may stop payment of a preauthorized electronic fund transfer by notifying the financial institution orally or in writing three or more business days before the scheduled date of such transfer. *Id.* Plaintiff argues that defendants have violated these provisions by continuing to debit his deposit account to pay off his overdraft account, notwithstanding his oral and written requests[5] that defendants cease debiting his account. *See* Docket No. 68 (Pl's Trial Brief) at 6.

There are several problems with plaintiff's EFTA claim. Most notably, the debits at issue are not "preauthorized electronic fund transfers." A "preauthorized electronic fund

---

[4] The court has serious doubts as to whether the § 1693f issue could be submitted to the jury, given that the complaint makes no mention of this section and contains no allegations that defendants failed to meet its procedural obligations under EFTA.

[5] Plaintiff testified to submitting written notice to defendants on a number of occasions. Only one, however, was written during the limitations period. Although plaintiff attempted to introduce the letters he purportedly wrote to HSBC, the court excluded them on the basis of hearsay and lack of foundation. An August 12, 2008 letter may be considered for notice purposes only, and it was apparently received by defendants. A response dated September 3, 2008 was sent by HSBC to plaintiff, apparently prompted by plaintiff's August 12 letter and copied to the comptroller of currency as referenced in HSBC's letter.

Plaintiff did little to tie up these loose ends in his testimony. Nevertheless, the court takes into account this "notice" and HSBC's response. Despite this consideration, for the reasons explained herein, it does not save plaintiff's EFTA claim.

transfer" is defined as "an electronic fund transfer authorized in advance to recur at substantially regular intervals." 15 U.S.C. § 1693a(9). Although the deposit account agreement authorizes defendants to use funds in the deposit account to pay off debts owed to HSBC, such authorization is not designed "to recur at substantially regular intervals." HSBC may have debited plaintiff's account on several occasions to offset the balance on his overdraft account, but plaintiff has provided no evidence that these offsets occurred, for example, at weekly, monthly, or annual intervals. The provisions related to "preauthorized electronic fund transfers" were aimed to protect "consumers who arrange for regular payments (such as insurance premiums or utility bills) to be deducted automatically from their bank accounts." S. Rep. 95-915, at 15 (1978). EFTA ensures that consumers only automatically pay their bills if they opt in to doing so, *see* §§ 1693e(a); 1693k(1); that they are informed of any variation in the amounts being automatically deducted, *see* § 1693e(b), and that they can opt out of such automatic payments at any time, *see* § 1693e(a). The deposit account agreement authorizes defendants to use funds available in that account to cover amounts due in other accounts; it does not arrange for any payments to occur at substantially regular intervals.

Moreover, the debits at issue here are not "electronic fund transfers" for purposes of the EFTA. Regulation E, which implements EFTA, "identifies certain transfers which, while literally electronic transfers of funds, are not 'electronic fund transfers' for purposes of the EFTA." *Krutchkoff v. Fleet Bank, N.A.*, 960 F.Supp. 541, 544 (D.Conn. 1996) (concluding that transfers between customer's credit card, checking and line of credit accounts were not "electronic fund transfers"). Regulation E provides:

> The term electronic fund transfer does not include . . . [a]ny transfer of funds under an agreement between a consumer and a financial institution which provides that the institution will initiate individual transfers without a specific request from the consumer:

5

[b]etween a consumer's accounts within the financial institution . . .

12 C.F.R. § 205.3(c)(5). The debits at issue here consisted of transfers from one of plaintiff's HSBC accounts (the deposit account) in order to cover an amount due under another HSBC account (the overdraft account) and were performed pursuant to an agreement between plaintiff and HSBC allowing such transfers without a specific customer request. As the court has previously held, plaintiff is bound by the terms of the deposit account agreement. *Okocha*, 700 F. Supp. 2d at 372 ("[P]laintiff is bound by the terms of that Deposit Account agreement with respect to those claims that relate to the allegedly unauthorized debiting of the Deposit Account."). The deposit account agreement provides: "If you owe the Bank money, the Bank can use the money in your account to pay the debt, even if withdrawing the money causes an interest penalty or you have a joint account. If the Bank charges your account, the Bank will send you a notice." Accordingly, the transfer of funds was under an agreement falling squarely within the exclusions of Regulation E.

Because the debits at issue here are not "electronic fund transfers," plaintiff's arguments regarding § 1693f's mandatory error resolution procedures also fail. *See Krutchkoff*, 960 F. Supp. at 544 (dismissing § 1693f claim). Even if the debits did fall under EFTA, plaintiff has adduced no evidence that defendants in any way failed to comply with the technical requirements of § 1693f.

Accordingly, there is no legally sufficient basis for plaintiff's EFTA claim.

II.   Claim 2: TILA

Plaintiff claims that defendants misrepresented the amount of over-limit and late-payment fees that plaintiff would be charged for use of the overdraft account. He has presented, however, no evidence indicating that defendants failed to adequately disclose these fees.

6

To the extent that plaintiff's claim falls under 15 U.S.C. § 1666,[6] he also has failed to show a violation of TILA.[7] Under that provision, if an obligor believes that a billing statement contains a "billing error," he may send the creditor a written notice setting forth that belief, indicating the amount of the error and the reasons supporting his belief that an error exists. If the creditor receives such a notice within 60 days of transmitting the statement of account, TILA imposes two separate obligations upon the creditor: (1) within 30 days, it must send a written acknowledgment that it has received the notice; and (2) within 90 days or two complete billing cycles, whichever is shorter, it must investigate the matter and either make appropriate corrections in the obligor's account or send a written explanation of its belief that the original statement sent to the obligor was correct. The creditor must send its explanation before making any attempt to collect the disputed amount. *See* 15 U.S.C. § 1666(a); *Am. Express Co. v. Koerner*, 452 U.S. 233, 235-38 (1981).

To succeed on this claim, plaintiff must show (1) the existence of a billing error, (2) timely notification of the billing error, and (3) failure of the bank issuing the card to comply with the procedural requirements of § 1666. *Cunningham v. Bank One*, 487 F. Supp. 2d 1189, 1191 (W.D. Wash. 2007). Plaintiff has not introduced any written notice that would trigger defendant's procedural obligations under TILA. *See Owusu v. N.Y. State Ins.*, 655 F. Supp. 2d

---

[6]  The complaint makes no reference to § 1666 or the procedural obligations contained therein. The court's March 25, 2010 order notes that plaintiff alleges a § 1666 violation for the first time in his summary judgment response brief. *Okocha*, 700 F. Supp. 2d at 373. Nonetheless, defendants have proceeded under the assumption that § 1666 remains at issue, and the court will address plaintiff's arguments on the merits.

[7]  Section 1666 falls under a specific part of TILA known as the Fair Credit Billing Act, Pub. L. No. 93-495, tit. III, § 301, 88 Stat. 1500, 1510-11 (1974).

308, 321 (S.D.N.Y. 2009) (rejecting § 1666 claim where plaintiff "presents no evidence that he ever notified HSBC that he was not receiving account statements"). Even assuming that he did provide such notice, he also has failed to make any showing that HSBC failed to investigate his dispute or otherwise comply with the requirements of the statute.

Lastly, the court has serious doubts that the challenged conduct—misrepresented over-limit and late payment fees—constitutes a "billing error" for purposes of § 1666. The statute provides seven categories of cognizable "billing errors," only three of which are potentially relevant here:

(1) A reflection on a statement of an extension of credit which was not made to the obligor or, if made, was not in the amount reflected on such statement.

(2) A reflection on a statement of an extension of credit for which the obligor requests additional clarification including documentary evidence thereof.

. . .

(5) A computation error or similar error of an accounting nature of the creditor on a statement.

15 U.S.C. § 1666(b). At least one court has held that improperly disclosed over-limit and late payment fees do not fall within these definitions. *Esquibel v. Chase Manhattan Bank USA, N.A.*, 487 F. Supp. 2d 818 (S.D. Tex. 2007), *aff'd* 276 Fed.Appx. 393 (5th Cir. 2008).[8] An over-limit

---

[8] There is a split among district courts regarding the similar issue of whether finance charges are "billing errors" under § 1666. Most courts to have addressed the issue have held that they are not, because "finance charges" are defined in the statute as merely "incidental" to an "extension of credit." *See Hill v. Chase Bank USA, N.A.*, 2010 WL 107192, at * 6 (N.D. Ind. 2010); *Langenfeld v. Chase Bank USA, N.A.*, 537 F. Supp. 2d 1181 (N.D. Okla. 2008); *Cunningham*, 487 F. Supp. 2d at 1195-96; *Esquibel*, 487 F. Supp .2d at 828. *But see Raney v. First Nat'l Bank of Neb., Inc.*, No. 06-8-DLB, 2006 WL 2588105, at * 3 (E.D. Ky. Sept.8, 2006) ("[B]ecause the provisions of TILA are interpreted liberally, the Court concludes that allegedly improper finance charges may qualify as billing errors for purposes of § 1666(b)."); *Eicken v. USAA Federal Sav. Bank*, No. H-05-4139,

fee is defined elsewhere in TILA as "[a]ny fee imposed *in connection with* an extension of credit in excess of the amount of credit authorized to be extended with respect to such account," strongly suggesting that the over-limit fee is not itself an "extension of credit" under the first two definitions above. 15 U.S.C. § 1637(c)(1)(B)(iii) (emphasis added); *Esquibel*, 48 F. Supp. 2d at 829 ("[O]ver-the-limit fees are something other than extensions of credit. They are assessed *in connection with* extensions of credit") (emphasis in original). "A creditor 'extends credit to an individual . . . when it opens or renews an account, as well as when the cardholder actually uses the credit card to make purchases.'" *Id.* (quoting *Koerner*, 452 U.S. at 241). "The assessment of a penalty for exceeding the authorized credit limit or for failing to make a timely payment is not a purchase to which the right to defer payment attaches." *Id.*

Moreover, improperly disclosed over-limit and late payment fees do not appear to be the type of "computation error" envisioned by the third definition of "billing error." As one court persuasively reasoned:

> It must be remembered that the dispute process set up by § 1666(a) forces a creditor to timely and adequately respond to a computational error identified by the obligor. This necessarily contemplates that a creditor has made a specific computational or accounting mistake on a particular statement, not a global mistake that will infinitely impact the current balance owed and therefore result in a never-ending "computation" error. Further, it is nearly impossible for a creditor to undo the allegedly "incorrect" finance charges imposed for the life of the account and respond appropriately within the required time frame.

*Langenfeld*, 537 F. Supp. 2d at 1201. Plaintiff is not disputing a computation error regarding fees on a particular statement or arguing that defendants should have corrected that statement.

---

2006 WL 1663371, at * 2 (S.D. Tex. June 12, 2006). The implementing regulations, however, exclude over-limit and late payment fees from the definition of "finance charge." 12 C.F.R. § 226.4(c)(2); *see Esquibel*, 487 F. Supp. 2d at 828

9

Instead, he makes a more global argument—albeit obliquely at best— that the over-limit and late payment fees associated with his overdraft account were improperly disclosed.

Plaintiff has not provided evidence that is legally sufficient to establish any of the elements of his claim under 15 U.S.C. § 1666.

III.     Claim 3: FCRA

The Fair Credit Reporting Act was enacted to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy. *Safeco Ins. Co. of Am. v. Burr*, 551 US. 47, 52 (2007). The Act imposes duties both on credit reporting agencies and on the creditors who furnish information to credit reporting agencies. At issue in this case are a furnisher's duty to reasonably investigate disputed information contained in a credit report. *See, e.g*, *Chiang v. Verizon New England*, 595 F.3d 26, 37 (1st Cir. 2010); *Johnson v. MBNA America Bank*, 357 F.3d 426, 432-33 (4th Cir. 2004). If a consumer notifies a credit reporting agency that he or she disputes the accuracy of an item in his file, the Act requires the agency to notify the furnisher of the dispute. 15 U.S.C. § 1681i(a)(2). Upon receiving this notice, the furnisher must (1) conduct an investigation with respect to the disputed information; (2) review all relevant information provided to it by the credit reporting agency; (3) report the results of the investigation to the credit reporting agency; and (4) if the investigation finds that the information is incomplete or inaccurate, report those results to all of the major credit reporting agencies. 15 U.S.C. §§ 1681s-2(b)(1)-(2).

"The FCRA creates a private right of action against credit reporting agencies for the negligent, *see* 15 U.S.C. § 1681o, or willful, *see id.* § 1681n, violation of any duty imposed under the statute." *Casella v. Equifax Credit Info. Servs.*, 56 F.3d 469, 473 (2d Cir. 1995). In order to recover under a negligence theory, plaintiff must establish actual damages attributable to

defendants' unreasonable investigation. *Burns v. Bank of America*, 655 F. Supp. 2d 240, 250 (S.D.N.Y. 2008). If plaintiff establishes that defendants' violation was willful, he need not show actual damages and is entitled to statutory and punitive damages. *See id.*

Plaintiff's FCRA claim fails for several reasons. Perhaps most puzzlingly, plaintiff presented *no* witnesses in his case-in-chief concerning HSBC's investigation of his credit agency dispute. He made no attempt to call any of defendants' employees as witnesses in his case-in-chief. Although one of *defendants'* witnesses testified to HSBC's credit report dispute procedures, even if plaintiff is given the benefit of this additional witness, he did not elicit any evidence on cross-examination that sufficiently supported his claims. Ms. Nylund's testimony in no way establishes that HSBC's investigation was objectively unreasonable in light of what it was told by the credit bureau. *See Chiang*, 595 F.3d at 38 ("[T]he central inquiry when assessing a consumer's claim under § 1681s-2(b) is 'whether the furnisher's procedures were reasonable in light of what it learned about the nature of the dispute from the description in the CRA's notice of dispute." (quoting *Gorman v. Wolpoff*, 584 F.3d 1147, 1157 (9th Cir. 2009))). Even if her testimony might arguably suggest that defendants' investigation was somewhat brief, it comes nowhere near establishing that HSBC knowingly and intentionally violated the FCRA or acted with reckless disregard for its duties under the statute. Accordingly, plaintiff has presented no evidence of willfulness. *See Safeco*, 551 U.S. at 57.

Nor has plaintiff presented legally sufficient evidence of actual damages. "To obtain an award of actual damages under the FCRA, Plaintiff[] must present evidence of a causal relation between the violation of the statute and the loss of credit, or some other harm." *Burns*, 655 F. Supp. 2d at 250 (citation omitted). Plaintiff must provide at least some evidence that his denial of consumer credit or similar lost opportunities are attributable to defendants' failure to correct

11

the furnished information after receiving notice of the dispute. Plaintiff has provided no admissible evidence establishing that he was denied credit—or any other opportunity—as a result of uncorrected information contained within his credit report. *See Gorman v. Experian Info. Sys.*, 2008 WL 4934047, at *9 (S.D.N.Y. Nov. 19, 2008) ("Plaintiff has offered no evidence that the lenders denied his mortgage applications based on any information provided by HSBC, either directly or indirectly."). He has not demonstrated that any potential creditor even *saw* his report, let alone that he was denied credit on that basis.

Although actual damages under the FCRA may encompass pain and suffering, plaintiff has not demonstrated that any emotional distress he experienced is fairly attributable to defendants' unreasonable investigation of his dispute. Firstly, plaintiff must present concrete evidence of such distress (e.g., medical reports), and his own conclusory allegations are insufficient. *Burns*, 655 F. Supp. 2d at 51 (citing *Denius v. Dunlap*, 330 F.3d 919, 930 (7th Cir. 2003) (plaintiff's "bare allegations that he was 'embarrassed' and 'humiliated' were insufficient to justify sending the issue to the jury")). Even if the brief testimony of his friend, Dr. Nwokedi, sufficiently corroborate plaintiff's own testimony regarding his pain and suffering, he still has failed to link such distress with the release of inaccurate information to creditors. As the Second Circuit has observed:

> No rational trier of fact could infer from this record that any potential creditor or other person in appellant's community learned of any harmful information from appellees. Casella's argument boils down to the bare contention that he is entitled to damages for pain and suffering simply because he knew of an inaccurate and potentially damaging item in his credit report. We are unaware of any case extending FCRA damages that far . . . and we decline to reach that result here . . . [W]e do not believe a plaintiff can recover for pain and suffering when he has failed to show that any creditor or other person ever learned of the derogatory information from a credit reporting agency.

*Casella*, 56 F.3d at 475. Plaintiff has produced no admissible evidence that a creditor became aware of his debt and delinquency on the overdraft account. Accordingly, he has not established the requisite causation between any malfeasance by defendants and his own purported pain and suffering.

Because there is no legally sufficient evidence of defendant's unreasonable investigation under § 1681s-2(b), of defendants' willful violation of the statute, or of any actual damages suffered by plaintiff, claim 5 must be dismissed.

IV.   Claim 15: Negligence

"It is well established that before a defendant may be held liable for negligence it must be shown that the defendant owes a duty to the plaintiff." *Pulka v. Edelman*, 40 N.Y.2d 781, 782 (1976). Defendants cite a long string of cases concluding that a banking relationship with a debtor does not normally give rise to a tort duty on the part of the creditor. *See* Docket No. 74 (Defts' Amended Trial Brief) at 20-21. Plaintiff has never articulated any basis for concluding that defendants owed plaintiff a duty of reasonable care under New York law, notwithstanding counsel's representations that he would provide case law supporting such a duty. Although tort duty might conceivably arise from statutory duties imposed by federal law, *see Gaft v. Mitsubishi Motor Credit*, No. 07-CV-527 (NG)(LB), 2009 WL 3148764, at *12 (E.D.N.Y. Sept. 29, 2009), or from some explicit representation by HSBC, *see Jones v. Commerce Bancorp, Inc.*, No. 06 Civ. 835 (HB), 2006 WL 1409492, at *2 (S.D.N.Y. May 23, 2006), it is not the court's responsibility to concoct such a theory on plaintiff's behalf. To the extent that state law tort

duties might arise under the federal statutes discussed above, however, the court notes that plaintiff has failed to establish a violation of those duties.

Even if such a duty existed, the record is utterly devoid of any proof that defendant acted objectively unreasonably. Plaintiff's state law negligence claim is limited to HSBC's general internal systems of review regarding account disputes, and does not encompass investigation of credit report disputes. *See Okocha*, 700 F. Supp. 2d at 377 (state claims regarding such investigations are preempted by the FCRA). Again, plaintiff called no witness who could testify as to HSBC's internal review procedures, and to the extent that the court considers defendants' case-in-chief, the testimony at trial lacks any indication that defendants failed to do something that a reasonably prudent person would have done when handling a dispute concerning a debt arising over ten years earlier.

Accordingly, plaintiff's negligence claim lacked sufficient legal and evidentiary support to properly submit to the jury.

Conclusion

For the foregoing reasons, defendants' motion for judgment as a matter of the law pursuant to Rule 50 is GRANTED, and plaintiff's remaining claims are DISMISSED. The clerk of the court is directed to CLOSE this case.

IT IS SO ORDERED.

Dated: December 14, 2010

Marilyn Hall Patel